Marshall KLAVAN, M.D., an incompetent, by Jerome J. Shestack, ESQ., guardian ad litem,

v.

CROZER–CHESTER MEDICAL CENTER, et al.

No. CIV. A. 99–2016.

United States District Court, E.D. Pennsylvania.

Aug. 16, 1999.

**439**

James Lewis Griffith, Klett, Lieber, Rooney & Schorling, Philadelphia, PA, for Plaintiff.

Sharon M. Reiss, Jonathan B. Sprague, Post & Schell, Philadelphia, PA, for Crozer Chester Medical Center, Nora Marden, R.N., Joan K. Richards.

Stephen A. Ryan, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Sat P. Arora, M.D., Alan Barman, D.O.

Daniel F. Ryan, III, O'Brien & Ryan, Plymouth Meeting, PA, for James Clark, M.D.

David J. Griffith, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for Phyllis Shaprio, M.D.

Deborah M. Knight, Goldfein & Joseph, Philadelphia, PA, for Richard Malamut, M.D.

1. For simplicity, we will refer to Dr. Klavan and Mr. Shestack simply as "plaintiff" or "Dr. Klavan."

2. The defendants in this matter are Crozer–Chester Medical Center, a Pennsylvania not-for-profit hospital in Upland, Pennsylvania, five doctors at Crozer–Chester (Sat P. Arora, M.D., James E. Clark, M.D., Phyllis A. Shapi-

*MEMORANDUM*

DALZELL, District Judge.

In this sad and novel action, plaintiff Marshall Klavan, M.D., through his guardian *ad litem*, Jerome J. Shestack, Esq.,[1] is attempting to sue the defendants[2] for "wrongful life" and their alleged violation of his liberty interest in refusing unwanted medical treatment. Because we find that Dr. Klavan has failed to allege a set of facts to demonstrate that the defendants were state actors, we will grant the defendants' motions to dismiss.

### I. Facts

The facts alleged here are the stuff of tragedy. Until April of 1997, Dr. Klavan was a "highly regarded, respected and competent physician." Compl. at ¶ 16. He was the Chief and Director of the Obstetrics and Gynecology Department of Crozer–Chester Medical Center (hereinafter "CCMC") in Upland, Pennsylvania.

On March 13, 1993, Dr. Klavan consulted with his personal attorney, Sidney Margulies, Esq., and thereafter adopted an Advance Medical Directive (hereinafter "AMD") providing that, under certain circumstances, he "absolutely did not want any extraordinary care measures utilized by health care providers." Compl. at ¶ 19. According to his complaint, Dr. Klavan had a "deep fear" of suffering a stroke, as he had observed his father's complete debilitation after having one, and he preferred to die rather than be forced to live in a condition like his father's. *See* Compl. at ¶ 20.

On April 29, 1997, over four years after adopting the AMD, Dr. Klavan attempted suicide. He left suicide notes for his wife,

ro, M.D., Alan Barman, D.O., and Richard I. Malamut, M.D.), a Crozer–Chester nurse (Nora Marden, R.N.), Joan K. Richards, the president of Crozer–Chester, and John and Jane Doe, a physician and an attorney, respectively. Because our analysis is the same for all of the defendants, we will refer to them collectively as "defendants."

his children, and a close family friend. He also left notes on his desk stating that. he did not want to be resuscitated. *Id.* at ¶¶ 21, 22. Employees of CCMC found Dr. Klavan unconscious at his desk the following morning and took him to CCMC's emergency room, where defendants undertook extreme medical measures and successfully resuscitated him. *Id.* at ¶ 23.

On May 2, 1997, Dr. Klavan's attorney and family told defendants about Dr. Klavan's AMD and his notes stating that he did not want to be resuscitated. At that time, Dr. Klavan was on "Level 2" care, which included treatment that he had expressly prohibited in his AMD. By this point, Dr. Klavan had deteriorated into a persistent vegetative state.

Two days later, on May 4, after a long discussion with Paula Klavan, plaintiff's wife, defendants agreed to provide care in accordance with the AMD and reduced Dr. Klavan's care to "Stage 4." However, the next day, when Dr. Klavan experienced a "life-threatening worsening of his condition," defendant Joan K. Richards, the president of defendant CCMC, allegedly instructed the other defendants to ignore the AMD. Defendants again used extraordinary measures to resuscitate Dr. Klavan, who then suffered a stroke that rendered him mentally and physically incompetent.

Dr. Klavan, through his guardian *ad litem,* thereafter filed this action. He asserts claims under the Fourteenth Amendment and Pennsylvania law. His Fourteenth Amendment claim is based on his protected liberty interest in refusing medical treatment, a right the Supreme Court recognized in *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). We find, however, that Dr. Klavan has not alleged sufficient facts for us to conclude that defendants were "state actors," a necessary predicate for his Fourteenth Amendment claim.

## II. *Procedural Posture*

■ Several of the defendants have filed motions to dismiss the complaint under both Fed.R.Civ.P. 12(b)(1) (for lack of subject matter jurisdiction) and under 12(b)(6) (for failure to state a claim upon which relief may be granted). In *Boyle v. Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 74 (3d Cir.1991), our Court of Appeals held that where a motion to dismiss is based on the lack of state action, dismissal is proper only under Rule 12(b)(6) for failure to state a claim. Because we reach only the defendants' state action claims, we treat the motion solely as one under Rule 12(b)(6).[3]

■ When considering a motion to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), we must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. Dismissal under Rule 12(b)(6) ... is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved," *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *see also H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). However, we are not required to accept the plaintiff's alleged or implied legal conclusions. *See Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993).

## III. *State Action Analysis*

■ Dr. Klavan attempts to sue the defendants directly under the Fourteenth Amendment. *See* Compl. at ¶ 13. His claim is that he has a constitutionally protected liberty interest, under the Fourteenth Amendment's due process clause, in refusing unwanted medical treatment. The Fourteenth Amendment, however, offers no shield against private conduct. *See Jackson v. Metropolitan Edison Co.,* 419

---

**3.** Defendants set forth many arguments for why we should dismiss Dr. Klavan's state law claims; however, because of our determination that the defendants are not state actors and our decision to decline to exercise supplemental jurisdiction over Dr. Klavan's state law claims, we will not address those arguments.

U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). For the Fourteenth Amendment to apply, "state action" is required. Liability will attach only if it can be said that the state is responsible for the specific conduct that Dr. Klavan complains about. *See Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141–42 (3d Cir.1995).

The Supreme Court has not developed one unitary test to determine whether there has been state action. It has instead employed at least three discrete tests. These are the "traditional exclusive governmental function" test, the "symbiotic relationship" test, and the "close nexus" test. Which test we apply in any given case depends on the particular facts and circumstances.

■ The lines that separate these tests are far from bright, and our Court of Appeals has noted that we are not foreclosed from employing various approaches as may be warranted under the facts of the case before us. Whichever approach we use, however, the heart of the inquiry is "to discern if the defendant 'exercised

power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." ' " *Groman v. Township of Manalapan,* 47 F.3d 628, 639 n. 17 (3d Cir.1995) (quoting *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941))).[4]

■ Dr. Klavan concedes that the defendants are not state actors under the "traditional exclusive governmental function" test.[5] *See* Pl.'s Br. at 17. Rather, he argues that they are state actors under the "symbiotic relationship" and "close nexus" tests. We will therefore examine both of these tests.

### A. The "Symbiotic Relationship" Test

■ The "symbiotic relationship" test examines the relationship between the state and the alleged wrongdoer to discern whether there is a great degree of interdependence between the two. Under this test, a private party will be deemed a state actor if "the State has so far insinuated itself into a position of interdependence

---

**4.** The Supreme Court's 1982 *"Lugar* trilogy" guides our "state action" inquiry. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (holding that a creditor's joint participation with the state in a pre-judgment attachment transformed the creditor into a state actor for the debtor's § 1983 claims challenging the validity of the state statutes, but not for the creditor's alleged misuse of the statutes, because that conduct could not be attributed to the state); *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (holding that a school was not a state actor even though it had to comply with many state regulations to be eligible for state funding and almost all of its students had been referred to it by the state); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (holding that a privately owned nursing home that received ninety percent of its funding from the state and was subject to significant state regulation was nevertheless not a state actor).

**5.** Even absent Dr. Klavan's concession on this point, we would not have characterized defendants as state actors under this test.

Under this test, the relevant inquiry "is not simply whether a private group is serving a 'public function', [but] whether the function performed has been 'traditionally the *exclusive* prerogative of the State.' " *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. 2764. Examples of "traditional exclusive governmental functions" include holding elections and exercising powers of eminent domain. The Supreme Court has rarely found the "exclusivity" aspect of this test to be met. *See Mark,* 51 F.3d at 1142. Furthermore, courts have held that the provision of hospital services is not a traditional public function exclusively reserved to the state. *See, e.g., Shannon v. Shannon,* 965 F.2d 542, 547 (7th Cir.1992); *Cardio–Medical Assocs., Ltd. v. Crozer–Chester Med. Ctr.,* 536 F.Supp. 1065, 1090–91 (E.D.Pa.1982) (holding that CCMC's activities did not amount to a traditional exclusive public function); *Holton v. Crozer–Chester Med. Ctr.,* 419 F.Supp. 334, 338 n. 2 (E.D.Pa.1976) (same), *rev'd on other grounds,* 560 F.2d 575 (3d Cir.1977).

[with the private party] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

▇▇▇ Under post-*Burton* jurisprudence, state regulation is not enough to render the actions of an institution state actions, even if the regulation is pervasive, extensive, and detailed. *See Jackson*, 419 U.S. at 358–59, 95 S.Ct. 449; *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176–77, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Nor will extensive financial assistance constitute state action. *See, e.g., Rendell–Baker*, 457 U.S. at 840–43, 102 S.Ct. 2764; *Hodge v. Paoli Mem. Hosp.*, 576 F.2d 563 (3d Cir.1978) (per curiam).

### B. The "Close Nexus" Test

▇▇▇ The "close nexus" test differs from the "symbiotic relationship" test in that it focuses on the connection between the state and the *specific conduct* that allegedly violated the plaintiff's civil rights, whereas the symbiotic relationship test focuses on the entire relationship between the state and the defendants. Under this test, the inquiry is "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson*, 419 U.S. at 351, 95 S.Ct. 449; *see also American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, ——, 119 S.Ct. 977, 986, 143 L.Ed.2d 130 (1999) ("Whether … a [sufficiently] close nexus exists … depends on whether the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." (internal quotation omitted)).

▇▇▇ Action private entities take with the mere approval or acquiescence of the state is not state action under this test. *See id.* The purpose of this test is "to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777.

▇▇▇ Under this test, the state's mere regulation of a private actor is not enough to establish "state action." Rather, what is required is that the state *coerce* or *encourage* a private party to act in a manner that violates the plaintiff's constitutional rights.

### C. Defendants are not State Actors Under Either Test

Dr. Klavan argues that the defendants are state actors under the "symbiotic relationship" and "close nexus" tests for five reasons: defendants' (1) receipt of Hill–Burton construction funds; (2) receipt of Medicare and Medicaid payments; (3) compliance with state and federal licensing requirements and regulations; (4) responsibility under federal and state law to inform patients of their right to refuse treatment; and (5) responsibility under the Pennsylvania Advance Directive for Health Care Act either to comply with the patient's AMD or transfer him, coupled with defendants' failure to seek a judicial determination regarding the validity of Dr. Klavan's AMD. *See* Pl.'s Br. at 16.

### 1. Receipt of Hill–Burton, Medicare, and Medicaid Funds

▇▇▇ In *Hodge*, 576 F.2d at 564, our Court of Appeals elected to "stand with the vast majority of courts of appeals and hold that the receipt of Hill–Burton construction funding, Medicare and Medicaid funds, and the existence of tax exemption, as well as state licensing requirements for nonprofit hospitals, do not constitute state action under 42 U.S.C. § 1983." [6] Four

---

**6.** For most purposes, including our purpose here, the "state action" inquiry is identical under the Fourteenth Amendment and

§ 1983. *See, e.g., Lugar*, 457 U.S. at 935–36 n. 18, 102 S.Ct. 2744; *Groman*, 47 F.3d at 638 n. 15.

years later, the Supreme Court in *Blum* reached the same conclusion, holding that despite the state's subsidization of the operating and capital costs of nursing homes, payment of the medical expenses of more than ninety percent of the nursing homes' residents, and licensing of the facilities, the state was still not responsible for the nursing homes' decisions. *See also, e.g., Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 258 (1st Cir.1994) (holding that "government regulation, even extensive regulation, and the receipt of federal funds, such as Medicare, Medicaid and Hill–Burton funds, are insufficient to establish that a hospital or other entity acted under color of state law"). Based on this abundance of case law, we find that defendants' receipt of government funding, even if combined with the state action "hooks" discussed below, does not render defendants state actors, regardless of which test we employ.

### 2. *Government Licensing and Regulation*

Dr. Klavan alleges that the defendants' (a) compliance with state and federal licensing requirements, (b) obligations under federal and state law to inform patients of their right to refuse treatment, and (c) responsibility under and violation of Pennsylvania's Advance Directive for Health Care Act together render them state actors. We disagree.

In *Sullivan,* the Supreme Court noted that "[i]n cases involving extensive state regulation of private activity, we have consistently held that [t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." 526 U.S. at ——, 119 S.Ct. at 986, quoting *Jackson,* 419 U.S. at 350, 95 S.Ct. 449. See also, for example, *Blum,* in which the Court held that private nursing homes were not state actors despite extensive government regulation, and *Moose Lodge,* 407 U.S. at 173, 92 S.Ct. 1965, in which the Court held that racial discrimination by a private club that was subject to extensive state regulation was not state action.

We find that government regulation of the defendants, even when combined with the other factors Dr. Klavan alleges in his complaint, does not create a "symbiotic relationship" between the defendants and the state. In *Groman,* our Court of Appeals noted that "the interdependence between the state and private actor must be pronounced before the law will transform the private actor into a state actor." 47 F.3d at 641. There is nothing to suggest that the regulation involved in this matter is any more "pronounced" than that in *Sullivan, Blum,* or the myriad of other cases finding no state action despite extensive government regulation, and we therefore find no symbiotic relationship present here. Dr. Klavan has failed to allege facts that would support an inference of a symbiotic relationship between the government and the defendants.

Nor do we find any "close nexus" between the regulation of the defendants and their decisions with respect to Dr. Klavan's medical treatment. Dr. Klavan has failed to allege anything in any state or federal regulation or licensing requirement that coerced, encouraged, or in any way influenced the defendants' decisions with respect to him.

We therefore reject Dr. Klavan's argument that defendants are state actors based on the government's extensive regulation of them.

### 3. Responsibility Under and

#### *Violation of Pennsylvania Law*

Dr. Klavan's final argument is his most creative and complicated. He argues that, under Pennsylvania's Advance Directive for Health Care Act, 20 Pa. Cons. Stat. § 5401 *et seq.* (West Supp.1999), the defendants were charged with the affirmative responsibility of ensuring compliance with patients' AMDs. When defendants refused to honor his AMD, and did not seek a court order permitting them to treat Dr. Klavan, they effectively usurped his decision-making power, so the argu-

ment goes, and "stepped into the shoes of the state." Pl.'s Br. at 14.

■ However, we find that private action which allegedly violates a state law cannot, by that violation, create "state action." *Cf. Lugar*, 457 U.S. at 941, 102 S.Ct. 2744 (holding that "private misuse of a state statute does not describe conduct that can be attributed to the State"); *Denchy v. Education and Training Consultants*, 803 F.Supp. 1055, 1061 n. 7 (E.D.Pa.1992) ("If we were to accept plaintiffs' argument that ... noncompliance with [the Pennsylvania School Code] is tantamount to state action, then any violation of a state statute or regulation by an independent contractor of a governmental entity would give rise to a cause of action under 42 U.S.C. § 1983. This simply cannot be the case.").

We also find nothing in the Pennsylvania statute to suggest that the Pennsylvania General Assembly intended to confer state agency powers on health care providers who either follow or violate the statute. The statute does not create enough "interdependence" between the Commonwealth and the defendants to render them "joint participants" in the challenged activity. And there cannot be a "close nexus" between the Pennsylvania statute and the defendants' decisions because those decisions allegedly violated the very statute that plaintiff alleges conferred state agency powers on these defendants. There thus can be no close nexus between the Commonwealth and the allegedly unlawful acts of the defendants here.

We therefore find that defendants' responsibilities under, and alleged violation of, the Pennsylvania statute do not render them state actors, regardless of which test we employ. Plaintiff has alleged nothing which would warrant a finding of state action in this matter. We note that former Chief Judge Lord and Judge Newcomer reached the same conclusion, without the guidance of the *Lugar* trilogy, years ago. *See Cardio–Medical Assocs. v. Crozer–Chester Med. Ctr.*, 536 F.Supp. 1065, 1091 (E.D.Pa.1982) (Lord, C.J.) (holding that

CCMC and its employees were not state actors under either the symbiotic relationship or close nexus test); *Holton v. Crozer–Chester Med. Ctr.*, 419 F.Supp. 334, 339–42 (E.D.Pa.1976) (Newcomer, J.) (same), *rev'd on other grounds*, 560 F.2d 575 (3d Cir.1977).

Accordingly, we will dismiss Dr. Klavan's Fourteenth Amendment claim.

## IV. *Supplemental Jurisdiction*

■ Under 28 U.S.C. § 1367(c)(3), we may decline to exercise supplemental jurisdiction over state law claims if we have "dismissed all claims over which [we] had original jurisdiction." Before Congress adopted the supplemental jurisdiction statute, the Supreme Court had held in *United Mine Workers v. Gibbs* that "if the federal claims are dismissed before trial, ... the state claims should be dismissed as well." 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

While Dr. Klavan's situation cries out for prompt and definitive judicial resolution, we nevertheless decline to exercise our discretion under the supplemental jurisdiction statute precisely because of the gravity of his case. A federal court mindful of its limited jurisdiction should be reluctant to decide fundamental issues of public policy, especially a *state's* public policy. Excruciating and profound as these issues are in Dr. Klavan's case, a federal court should not interpose itself to decide them when the only warrant to do so is the slim jurisdictional reed of § 1367.

We therefore decline to exercise our jurisdiction under 28 U.S.C. § 1367(c).

## ORDER

AND NOW, this 16th day of August, 1999, upon consideration of the defendants' motions to dismiss plaintiff's complaint (docket entry nos. 6, 7, and 10), plaintiff's response thereto, and the reply brief of defendants Crozer–Chester Medical Center, Nora Marden, and Joan K. Richards, and for the reasons stated in the accompa-

nying Memorandum, it is hereby OR-DERED that:

1. Defendants' motions to dismiss are GRANTED;

2. Count I is DISMISSED for failure to state a claim upon which relief may be granted;

3. The Court having declined to exercise its jurisdiction as to the remaining Counts of the complaint, they are DISMISSED WITHOUT PREJUDICE to their reassertion in state court;

4. The petition of defendant James E. Clark to join in the motion of defendants Crozer–Chester Medical Center and Joan K. Richards to dismiss the complaint (docket entry # 9) is GRANTED AS UNOPPOSED;

5. The petition of defendant Nora Marden to join in the motion of defendants Crozer–Chester Medical Center and Joan K. Richards to dismiss the complaint (docket entry # 13) is GRANTED AS UNOPPOSED;

6. The petition of defendant James E. Clark to join in the motion of defendant Richard Malamut to dismiss the complaint (docket entry # 14) is GRANTED AS UNOPPOSED;

7. The motion of defendants Sat P. Arora and Alan Barman to extend the time to join the motions of co-defendants (docket entry # 16) is DENIED AS MOOT; and

8. The Clerk shall CLOSE this case statistically.