THE PINEY RUN PRESERVATION
ASSOCIATION

v.

COUNTY COMMISSIONERS OF
CARROLL COUNTY,
MARYLAND.

No. CIV. Y-98-3124.

United States District Court,
D. Maryland.

Feb. 10, 2000.

G. Macy Nelson, Towson, MD, for Plaintiff.

Linda S. Woolf, Baltimore, MD, Michael B. MacWilliams, Baltimore, MD, for Defendant.

## MEMORANDUM OPINION

YOUNG, Senior District Judge.

### I.

The Piney Run Preservation Association ["the Association"] is a non-profit citizens' group whose activities include the protec- tion of a stream known as Piney Run in Baltimore County, Maryland. Members of the Association reside in Baltimore County in the vicinity of the stream. The Maryland Department of the Environment ["MDE"] has designated Piney Run a Class III–P stream, which signifies that it supports the growth and propagation of trout and serves as a source of public drinking water. The Defendant, the County Commissioners of Carroll County ["the County"], operates a sewage treatment plant ["the Plant"] in Hampstead, Carroll County, Maryland. The Plant discharges treated sewage into Piney Run pursuant to a National Pollution Discharge Elimination System ["NPDES"] permit issued by MDE. The permit allows the County to discharge certain listed pollutants into Piney Run, but heat is not one of the pollutants listed in the permit.

In 1991, the County sought to modify its permit to increase the amount of effluent it discharged into Piney Run. After MDE determined that the increased effluent would comply with all applicable requirements, several landowners challenged the determination and requested an administrative hearing. They asserted that the Plant's current level of discharge violated the maximum temperature criterion for a Class III–P stream and contended that an increased flow would continue the thermal pollution of the stream. The temperature criterion at issue is found in the Maryland Administrative Code ["COMAR"], which under the heading "Criteria for Use III Waters—Natural Trout Waters," contains the following provision: "The maximum temperature outside the mixing zone ... may not exceed 68° F (20° C) or the ambient temperature of the surface waters, whichever is greater." COMAR § 26.08.02.03–3E.

The Circuit Court for Baltimore County affirmed MDE's decision in 1997. The landowners appealed to the Court of Special Appeals, which reversed the Circuit Court on August 17, 1998, and remanded the case to MDE for further factual find-

ings. Specifically, the court instructed MDE to determine: (1) with respect to the Plant and its discharge of effluent, where to measure the ambient temperature of Piney Run; (2) what the ambient temperature is in this case; (3) whether, at the current level of discharge, the temperature outside the mixing zone exceeds 20° C or the ambient temperature of the surface waters, whichever is greater; and (4) whether, with the proposed increase in effluent, the temperature outside the mixing zone will exceed 20° C or the ambient temperature of the surface waters, whichever is greater. MDE has not yet made its determination.

The Association filed this suit on September 16, 1998, alleging that the County violated the terms of its permit by discharging heat into Piney Run. On May 20, 1999, the Court granted partial summary judgment to the Association, finding that the County had violated the Clean Water Act ["CWA"]. *Piney Run Preservation Ass'n v. County Commissioners of Carroll County,* 50 F.Supp.2d 443 (D.Md.1999)(hereinafter *"Piney Run I"*). This ruling followed the Ninth Circuit in holding that citizens have standing to bring suit under the CWA to enforce water quality standards that have not been reduced to specific quantitative limitations in a NPDES permit. *See id.* at 445 (following *Northwest Environmental Advocates v. City of Portland,* 56 F.3d 979, 985–90 (9th Cir.1995)).

The Court also found that the Association established 183 CWA violations by the County. *Id.* at 446–47. Specifically, the Association provided undisputed temperature readings indicating that on 183 occasions, the County discharged waste water with a temperature exceeding the greater of either 68° F (20° C) or the ambient temperature of Piney Run. *See* COMAR § 26.08.02.03–3E. In reaching its decision, the Court interpreted the term "ambient"

in the Maryland Administrative Code to mean "encompassing," "atmospheric" or "surrounding on all sides." *See* Letter from the Court, Dec. 15, 1999. In this case, therefore, "ambient temperature" meant the temperature of the waterway into which the County made its discharges. Because the temperature of the Plant's effluent exceeded either 68°·F or the temperature of Piney Run upstream of the Plant on 183 separate days, the Court found 183 violations of the CWA. The issue of damages was set for trial.

The County filed a motion for reconsideration with this Court and a petition for leave to file an interlocutory appeal with the Fourth Circuit. Both were denied. On October 27, 1999, the County again moved for reconsideration. The Court denied that Motion by marginal order on December 15, 1999.

Between June 1 and November 4, 1999, the County collected and recorded temperature data from four locations on Piney Run: two locations upstream of the Plant's outfall and two locations downstream. The County also recorded the temperature of the Plant's effluent. These temperature readings were automatically taken by fixed "temperature loggers" every fifteen minutes, twenty-four hours a day, seven days a week. The parties agree that these temperature data are reliable, but differ as to the proper interpretation of the data and the conclusions the Court should draw from it. The Association argues that the County has violated the CWA because the Plant's effluent has exceeded the upstream temperature of Piney Run or 20° C, whichever was higher, during at least one reading on 107 separate days.[1] In contrast, the County points out that the temperature of the Plant's effluent infrequently exceeded the highest upstream temperature of Piney Run on any given calendar day. The County argues, therefore, that

---

1. The Association has also asked the Court to find that the County violated the CWA on every day that the Plant's effluent exceeded the upstream temperature of Piney Run. In *Piney Run I,* however, the Court made clear

that a violation occurs only where the Maryland water criterion is violated, i.e., when the effluent temperature exceeds 68° F (20° C) or the ambient temperature of the surface waters, whichever is greater.

something other than the Plant is heating Piney Run.

On November 12, 1999, the Association moved for summary judgment, seeking the Court's ruling on alleged CWA violations from June 1, 1999, through August 12, 1999. The County opposed the Motion and filed a Cross–Motion for Summary Judgment on November 29, which the Association opposed. The Court denied both Motions on December 15, 1999, due to disputed issues of material fact. A three-day non-jury trial was held on January 20, 21, and 24, 2000.

## II. Discussion

### A. *Standing.*

In *Piney Run I*, the Court held that the Association had standing to bring this CWA citizen suit to enforce state water quality standards for heat, even though heat is not listed as a pollutant in the Plant's permit. 50 F.Supp.2d at 445. The County now argues, however, that the Association lacks standing to bring this suit under Article III of the Constitution. Specifically, the County claims that the Association's members have not suffered a "particularized" injury that is traceable to the CWA violations involved in this case.

The Court disagrees. To meet the "case or controversy" standing requirements under Article III, a plaintiff[2] must show "(1) that it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be addressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.,* —— U.S. ——, 120 S.Ct. 693, 703, 145 L.Ed.2d 610 (2000). In *Friends,* an environmental group filed a citizens suit under the CWA seeking damages and injunctive relief related to pollution of the North Tyger River. Members of the group provided testimony and affidavits stating that they lived within several miles of the polluting facility and saw and smelled the contaminated river. *See id.* at 704. They also stated that they desired to use the area near the river for fishing, camping, and hiking, as they once had, but were prevented from doing so by concerns about pollution. *See id.* The Supreme Court held that the group had standing because the members' affidavits and testimony alleged that the discharges to the river and "reasonable concerns about the effects of those discharges" directly affected the members' "recreational, aesthetic, and economic interests." *Id.* at 705.

In light of the standards enunciated in *Friends,* the Association clearly has standing to bring the present suit. To begin, the Association presented the testimony of two landowners whose property is crossed by Piney Run. Perhaps no person is more likely to have Article III standing in a CWA citizen suit than a landowner whose land abuts or surrounds the water body at issue. Such a landowner undoubtedly suffers injury "in fact" from the reasonable fears of pollution on the borders of his or her property. Moreover, the landowner must cope with the loss of recreation, aesthetics, and economic value that the polluted waterway once brought to the land. Provided that the effects are real and traceable to the violations at issue, it would be hard to imagine a more "particularized" injury.

In this case, the Association provided the testimony of Dorothy Rowland, who stated that Piney Run bisects her property, which she purchased more than 30 years ago and uses to raise horses. She testified that, at one time, her horses took water from Piney Run, she enjoyed the stream as a source of recreation, and her children ice-skated on it in cold weather. In recent years, however, Ms. Rowland

---

**2.** An association may bring suit on behalf of its members when the members have standing as individuals. *See United Food & Commercial Workers Union v. Brown Group, Inc.,* 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

has seen Piney Run turn green with algae, and her fears about the stream's condition have caused her to stop watering horses from it. Furthermore, the stream no longer freezes, even during periods of very cold weather. Because these allegations present a clear instance of particularized injury in fact, the Court holds that Ms. Rowland has standing to bring the present suit.

Two other members of the Association provided similar testimony. Victoria Woodward owned property along Piney Run. She described the expanding algae in the river and her belief that the stream's pollution reduced the economic and recreational value of her property. Edward Halle testified that he can see Piney Run from his house and would like to use it for fishing and for recreation with his children, but will not do so because of the stream's condition. Mr. Halle decided to keep his children from playing in the stream after he noticed that Piney Run was green with algae, in contrast to the other clear streams that join Piney Run downstream from the Plant. Given that both Ms. Woodward and Mr. Halle alleged that they use Piney Run and are persons "for whom the aesthetic and recreational values of the area [have been] lessened" by the Plant's heat discharges, they have standing under Article III and, therefore, the Association is entitled to bring a citizens suit on their behalf. *See id.* at 705.

### B. *Motion to Strike the Testimony of Dr. Stauffer* [3]

The County moved at trial and filed a post-trial motion to strike the testimony of Dr. Stauffer—an expert witness proffered by the Association—insofar as it concerns the effects of water temperatures below 68°F (or 20° C) on brown trout. This

testimony, contends the County, is irrelevant because the Association is seeking damages for CWA violations relating to discharges that exceeded Maryland regulatory limits of 68° C.

██ The Court agrees, but only in part. The regulation at issue prohibits discharges that exceed the higher of 68° F (20° C) or the ambient temperature of the surface waters. Because most of the violations in this case involve discharges at temperatures over 68° F, the portion of Dr. Stauffer's testimony relating to lower temperatures has only minor significance. At the same time, however, the Association proved that on various occasions the Plant discharged effluent at a temperature that was lower than 68° F but higher than the ambient temperature of Piney Run. Dr. Stauffer's disputed testimony is relevant to these discharges. The Court, therefore, refuses to strike Dr. Stauffer's testimony on this issue, but has considered it in accordance with these findings.

The County also argues that Dr. Stauffer's testimony should be stricken because his opinions on brown trout populations in Piney Run "are based upon critical unsubstantiated assumptions that are not supported by any factual evidence in the case nor grounded in established scientific theory or reasoning." In particular, the County is concerned about the absence of conclusive evidence that Piney Run above Trenton Road does not currently contain brown trout or that it ever did contain brown trout.[4]

██ The Court refuses to strike the testimony. Although numerous factors come into play when a district judge makes the "gatekeeping" determination on a proffer of expert testimony, the Court's

---

**3.** The County also moved after trial to exclude the opinion testimony of Dr. Bouwer, the Association's other expert witness. The Court permitted the County to file its opposition to Dr. Stauffer's testimony in a post-trial memorandum, but because no serious dispute was raised with regard to the bulk of Dr. Bouwer's testimony during trial, the Court refuses to address the broad relevance issues now raised by the County.

**4.** Evidence such as this is relevant not to liability, but only to damages, for a violation of the state regulation is a violation of the CWA, whether or not brown trout populations were affected.

evaluation is flexible and seeks primarily to ensure that the testimony is relevant and reliable. *See Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999). Here, the evidence of damage to brown trout is not conclusive,[5] but the testimony presented by Dr. Stauffer is supported by facts in the record and, therefore, is admissible. The record shows that Piney Run supports brown trout at Trenton Road and downstream from that location. MDE has classified the stream as a Class III–P waterway, indicating that it is capable of supporting the growth and propagation of trout. Based on his examination of the stream and his expertise as an ichthyologist experienced in waters of the region, Dr. Stauffer agreed with this classification. He also testified that typical spring-fed streams in the region support trout upstream in the colder locations, but trout populations generally diminish downstream because of natural warming. Piney Run, in contrast, contains trout downstream, but not upstream in the vicinity of the Plant. In addition, Dr. Stauffer testified that high stream temperatures inhibit the growth of trout and discourage trout migration, and the record shows that the Plant has added heat to Piney Run.

Given this factual scenario, Dr. Stauffer opined that Piney Run once supported brown trout in the vicinity of the Plant, but the Plant's effluent could be inhibiting trout migration or propagation in the areas of Piney Run upstream from Trenton Road. The Court finds that this opinion, like many expert opinions, was based on an assumption, but that assumption is supported by evidence in the record. *See Tyger Constr. Co. v. Pensacola Const. Co.,* 29 F.3d 137, 142–43 (4th Cir.1994). More-

over, although one may doubt whether Dr. Stauffer's conclusions are ultimately correct, the Court finds that the underlying reasoning and methodology of the testimony was reliable, scientifically valid, and applicable to the facts in this case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court finds that Dr. Stauffer's opinions would be helpful to the trier of fact in determining the damage caused to Piney Run by the Plant's added heat. *See id.* at 591, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

### C. Liability

In *Piney Run I,* the Court held that the Plant violated the CWA by discharging effluent into Piney Run with a temperature exceeding the higher of 20° C or the ambient temperature of Piney Run. The undisputed temperature data for the period between July 1, 1999, and November 4, 1999, indicate that the temperature of the Plant's effluent violated this standard on 107 additional days. Adding this sum to the 183 violations identified in *Piney Run I,* the Court finds a total of 290 CWA violations.

The Association argues that *United States v. Smithfield Foods, Inc.,* 191 F.3d 516, 527 (4th Cir.1999), requires the Court to impose a penalty for each instance that the Plant's effluent exceeded the heat standard on the same day. The Court disagrees. Under *Smithfield,* courts should impose damages on a parameter-by-parameter basis for any given day. In other words, if a polluter's discharge exceeds two separate permit limitations on the same day, then each excess qualifies as

---

**5.** In its Motion, the County focuses on Dr. Stauffer's assumption that there are no brown trout in Piney Run above Trenton Mill. The County points out that although this assumption forms the basis for all of Dr. Stauffer's testimony, he cannot be absolutely sure that the assumption is accurate. The Court notes, however, that there is no evidence in the record to indicate that trout *do* currently reside in Piney Run upstream of Trenton Mill.

Indeed, the only evidence is to the contrary. If there are trout in Piney Run near the Plant, the County had the means to find them and present evidence thereof. It has not. To argue that the assumptions behind Dr. Stauffer's opinions "are not ... subject to objective, scientific validation," Def.'s Renewed Mot. to Strike Testimony at 17, therefore, is somewhat disingenuous.

a separate infraction, even if caused by the same waste stream. *See id.* at 528 n. 6. However, in the present case, the Association has proved that the Plant violated only one parameter—heat—though it may have done so various times on a given day. Although imposing a penalty for multiple violations of the same effluent limit may be appropriate in some circumstances, the Court is not prepared to do so under the facts of this case. The penalty structure of the CWA gives courts "considerable flexibility to tailor penalties to the unique facts of each case." *Id.* at 527. As discussed more fully below, this case involves several important mitigating factors that compel the Court to impose only one penalty for any day the Plant violated State thermal pollution limits.

### D. *Monetary Damages*

Courts have the authority to impose a maximum civil penalty of $25,000 per day for each violation of the CWA. *See* 33 U.S.C. § 1319(d); *Smithfield Foods*, 191 F.3d at 527. In determining the amount of any civil penalty under the CWA, however, the Court must consider six factors: "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and other such matters as justice may require." § 1319(d).

When calculating damages, courts generally employ either a "top-down" or "bottom-up" method. *See Smithfield*, 191 F.3d at 528. Courts following the "top-down" method first calculate the maximum penalty based on the $25,000 per day figure, then adjust the figure down, as necessary, to account for the six factors listed in § 1319(d). *See id.* at 528 n. 7. In contrast, the "bottom up" method requires the Court to determine the economic benefit the defendant derived by violating the Act, and then adjust that figure upward or downward using the remaining five factors

in § 1319(d). *See id.* at 528. Because the Act does not prescribe a particular method, the Court has discretion to choose. *See id.* The "highly discretionary calculations necessary to assess penalties [under the CWA] are particularly within the purview of trial judges" and, therefore, are granted wide deference. *Id.* at 529 (citing *Tull v. United States*, 481 U.S. 412, 426–27, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)).

Considering all the circumstances in the present case, a bottom-up approach is most appropriate. The starting point under this approach is the economic benefit the County gained by delaying compliance with the CWA. Because precise economic benefit is difficult to prove, "reasonable approximations ... will suffice." *Smithfield*, 191 F.3d at 529. The trial testimony indicated that the County has considered as many as four options to address its thermal pollution issues. Much of the testimony focused on a method of cooling the Plant's discharge by means of air-cooled "chillers." When the County undertook a feasibility study to evaluate options for cooling the Plant's effluent, it determined, based on a consultant's report, that the air-cooled chillers were the preferred option. Although this method involved lower initial costs than the other alternatives considered by the County,[6] it also required higher operational costs due to electricity demand. As such, the Court finds that the air-cooled chillers option provides a fair estimate of the County's "avoided cost" or economic benefit.

Furthermore, the Court determines that this cost should be calculated from November 1998, the date of the County's feasibility study. Although the County may have been aware of its thermal pollution at an earlier date, the feasibility study is the clearest indicator of the time the County recognized it as a problem. Using this later date also accounts for the months, if not years, of permit applications and approvals the County would have needed to install the chillers. Evidence introduced

---

**6.** The other alternatives were geothermal chillers and night cooling.

by the Association indicates that the initial cost of installing the chillers would have been $967,500 and annual costs, including operating expenses, would have been approximately $208,000 per year.[7] Because this case covers violations through November 1999, the Court will add one year's annual cost to the initial cost figure, rounding upward to approximate the shift from 1998 dollars to 1999. This adjustment brings the "reasonable approximation" of the County's economic benefit to $1.2 million.

Once the Court determines the defendant's economic benefit, the total penalty should be adjusted up or down, as necessary, considering the remaining five factors in § 1319(d). *See Smithfield,* 191 F.3d at 528. The Court makes the following findings with regard to those five factors:

### 1. *Seriousness of the Violations*

To determine the seriousness of the County's violations, the Court should consider the frequency and severity of the violations as well as their effect on the environment. *See United States v. Smithfield Foods, Inc.,* 972 F.Supp. 338, 343 (E.D.Va.1997). Although the Association has established 290 violations and has proved that the County added heat to Piney Run, the extent of damage caused by these violations is far from clear. The Association provided expert testimony to demonstrate that thermal pollution may induce algae growth and hamper brown trout development and propagation. At the same time, the County established that the heating of Piney Run, the growth of algae, and the diminution of brown trout could be linked to a variety of factors, including nutrients from agricultural activities, runoff from development, or stormwater collection activities. Moreover, on certain occasions, even though the Plant's effluent exceeded regulatory limits, it was cooler than upstream temperature readings in Piney Run. In short, although the Association proved that the Plant added heat and that thermal pollution has had a deleterious effect on Piney Run, it did not prove the extent of harm attributable to the Plant or even that the Plant is the major factor in the demise of Piney Run as a trout stream.

Nevertheless, the Court acknowledges that a significant penalty may be appropriate even absent proof of actual negative effect. *See id.* at 344 (citing cases). The Court is convinced that the Plant adds heat to Piney Run and that continued addition of heat will preclude the relevant portion of Piney Run from attracting brown trout in the future. In addition, any damage to Piney Run is exacerbated because it is identified not only as a trout stream, but also as a source of public drinking water. In spite of these considerations, however, the Court finds that this factor weighs in favor of a lower penalty for the County.

### 2. *History of Violations*

In determining the County's history of violations, the Court considers not only similar violations in the past, but also the duration and continuity of the County's present violations. *See Smithfield Foods,* 972 F.Supp. at 349. Testimony at trial indicated that the County recognized thermal discharges as a potential problem beginning as early as 1992. The County also established, however, that it did not consider these discharges to be permit violations, and the Court finds that this interpretation was not unreasonable. As discussed more fully below, the County believed, based on its own colorable legal determinations and experience with MDE, that it was in compliance with its permit provided that its discharges remained within explicit limitations in the permit. The Court is aware that the CWA is a

---

7. These costs appear in Plaintiff's Exhibit No. 38, the Hampstead Wastewater Treatment Plant Effluent Temperature Reduction Study, Carroll County Project No. S–306 (Nov.1998), which was prepared by an engineering consultant. The sums are in 1998 dollars and the annual cost figure is based on a 7% interest rate on the initial cost, spread over ten years, plus operational cost.

strict liability statute, *see id.* at 342 (citing *Stoddard v. Western Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir.1986)), but courts have discretion to adjust damages based on culpability, *see* 33 U.S.C. § 1319(d); *Smithfield Foods*, 972 F.Supp. at 353. In the present case, this factor justifies a downward adjustment in the County's penalty.

### 3. *Good–Faith Efforts to Comply*

Although significant efforts to mitigate negative environmental effects or to decrease the number of violations may justify a reduced damages award, *see Smithfield Foods*, 972 F.Supp. at 349–50, the Court finds the evidence in this area to be inconclusive. In short, the record shows that the County took several initial steps—e.g., studying options, submitting permit applications—to address its thermal pollution problems. Although the County may have experienced delays in obtaining the necessary permits, due in some part to factors beyond its control, it made no notable effort to expedite the process. The County's leisurely pace, the Court finds, cancels out its earlier efforts to come into compliance.

The record also shows that the County attempted to improve the Piney Run ecosystem by removing the concrete channel in favor of a naturally-meandering stream. The County did not undertake this project with the aim of reducing thermal pollution, but the Court acknowledges that the improvement of Piney Run would make it more likely to support brown trout populations, thus reducing the harm alleged in this case. The final damages determination, therefore, will reflect a credit for the County's effort.

### 4. *Economic Impact of the Penalty on the County*

The central purpose of CWA penalties is to deter the defendant, and others, from committing future violations. *See Smithfield Foods*, 972 F.Supp. at 352. A damage award that is limited to economic benefit, therefore, is no deterrent at all because the violator would be no worse off than if it had complied in the first place.

*See id.* In this context, municipalities—such as Carroll County—are distinct from private actors. Whereas a large penalty passed on to consumers in the form of higher prices may have a significant effect on a private polluter, a municipal polluter merely passes the costs on to its taxpayers who, in turn, have no option other than to pay the tax. Moreover, the testimony at trial showed that the County has already applied to install chillers and has allocated the necessary funds. In other words, the County is poised to remedy its violations. *Cf. id.* at 350. As such, it appears that the years of litigation on this matter, in concert with the injunction to be issued by this Court, will be sufficient to halt the Plant's violations. Additional deterrent in the form of a large penalty, therefore, is not necessary and would not serve a useful function at this time.

### 5. *Other Such Matters as Justice may Require*

Courts may adjust CWA penalties to account for the bad-faith conduct of the violator and its attitude towards achieving compliance. *See id.* at 353. The particular circumstances of this case deserve special attention under this factor. Until recently, the County believed that compliance with its permit was tantamount to compliance with the CWA—a doctrine known as the "permit shield." Although the Court has found that this belief was mistaken and an improper interpretation of existing law, the Court also finds that the County's position was not unreasonable. Moreover, this interpretation relied, in part, on prior experience and interaction with State permit authorities. Because the law was unclear and the County had a good faith belief in the permit shield doctrine, the Court finds that a downward adjustment of the penalty would be appropriate.

### 6. *Conclusion*

■ Based on an evaluation of the factors above, the Court will adjust the pen-

alty figure downward to \$400,000. This calculation accounts, in particular, for the Defendant's municipality status and its prior understanding of the permit shield doctrine, as well as a credit for removing the concrete channel on Piney Run.

### E. *Injunctive Relief*

The CWA authorizes district courts to enter injunctions in citizen suit proceedings. *See* 33 U.S.C. § 1365(a); *Friends*, 120 S.Ct. at 700. Considering the Court's findings that (a) the Plant continues to violate the CWA, (b) the Plant continues to add heat to Piney Run, and (c) these activities have a deleterious effect on Piney Run and members of the Association, injunctive relief is appropriate. Therefore, the Court will issue an injunction to address the specific injuries at issue. The Court's order will enjoin the Plant from discharging effluent into Piney Run at temperatures that exceed the higher of 20° C or the ambient stream temperature until MDE modifies the existing permit or issues a new permit to account for the unique aspects of Piney Run as a Class III–P stream and to comply with all relevant federal and state standards. To ensure compliance with this injunction, the Court will maintain jurisdiction over the case.

### F. *Costs and Fees*

In addition to monetary and injunctive relief, the CWA provides that a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). In consideration of the Association's efforts in this case, and its success in proving 290 violations of the CWA, the Court will award costs and reasonable attorneys fees to the Association. As noted at the trial, the Association must file its petition for costs and fees within ten days of judgment.

### III. Conclusion

Based on the foregoing analysis, the Court finds that the County is liable for 290 violations of the CWA. The Court will order the County to pay a penalty of \$400,000 to the United States Treasury in accordance with the CWA, plus costs and reasonable attorneys fees to the Association. The Court will also issue an injunction to protect Piney Run from further thermal pollution.

### ORDER

In accordance with the attached Memorandum, it is this 10th day of February 2000, by the United States District Court for the District of Maryland, ORDERED:

1. That the Defendant IS LIABLE for 290 violations of the Clean Water Act and SHALL PAY to the U.S. Treasury the sum of \$400,000, plus all costs and reasonable attorneys fees to the Plaintiff; and

2. That the Defendant SHALL CEASE any and all discharges of effluent into Piney Run at temperatures that exceed the higher of 20° C or the ambient temperature of Piney Run until such time as the Maryland Department of the Environment either: (a) modifies the existing permit to account for the unique aspects of Piney Run as a Class III–P stream and to comply with all relevant federal and state standards as set forth in this Court's decisions; or (b) issues a new permit that accounts for the unique aspects of Piney Run as a Class III–P stream and complies with all relevant federal and state standards as set forth in this Court's decisions.

3. That JUDGMENT BE ENTERED in favor of the Plaintiff; and

4. That copies of this Memorandum and Order be mailed to counsel for the parties.